# EXHIBIT A

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        ehorne@bursor.com

*Attorneys for Plaintiff*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**01/08/2024**
**Clerk of the Court**
BY: AUSTIN LAM
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| VISHAL SHAH, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>     v.<br><br>FANDOM, INC.,<br><br>                              Defendant. | Case No.   **CGC-24-611488**<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Vishal Shah ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Defendant Fandom, Inc. ("Defendant") owns and operates a website, Gamespot.com (the "Website" or "Gamespot").

2.     When users visit the Website, Defendant causes two trackers—the GumGum Tracker and Audiencerate Tracker (the "Trackers")—to be installed on Website visitors' internet browsers. Defendant then uses these Trackers to collect Website visitors' IP addresses.

3.     Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").  Cal. Penal Code § 638.50(b); *see also Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

4.     By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).

5.     Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

## PARTIES

6.     Plaintiff Shah resides in Orange County, California and has an intent to remain there, and is therefore a citizen of California.  Plaintiff Shah was in California when he visited the Website.

7.     Defendant Fandom, Inc. is a California company, with its principal place of business located in California.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution and Cal. Code Civ. Proc § 410.10. This action is brought as a class action on behalf of Plaintiff and Class Members pursuant to Cal. Code Civ. Proc. § 382.

9.     This Court has personal jurisdiction over Defendant because it is headquartered and incorporated in California.

10.     Venue is proper in this County because Defendant resides in this County.

## FACTUAL ALLEGATIONS

### I.     THE CALIFORNIA INVASION OF PRIVACY ACT

11.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

12.     As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

13.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

14.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

15.     In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

16.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.  As technology advanced, however, courts have expanded the application of these surveillance devices.

17.     For example, if a user *sends an email*, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if that same user *receives an email*, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

18.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

19.     Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.     DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

### A.     The Trackers Are "Pen Registers"

20.     To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  *See* Figure 1.

1

**Figure 1**:



21.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

22.    In addition, the server's instructions cause the Trackers to be installed on a user's browser.  The Trackers then cause the browser to send identifying information—including the user's IP address—to GumGum and Audiencerate.

23.    The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132).  Thus, the IP address enables a device to communicate with another device— such as a computer's browser communicating with a server—and the IP address contains geographical location.  Through an IP address, the device's state, city, and zip code can be determined.

24.    As alleged below, Defendant installs each of the Trackers on the user's browser, and the Trackers collect information—users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user.  Accordingly, the Trackers are each "pen registers."

    *1.    GumGum Tracker*

25.    GumGum, Inc. ("GumGum") is a software-as-a-service company that develops the GumGum Tracker, which it provides to website owners like Defendant for a fee.

26.    According to GumGum, it "delivers the next generation of contextual intelligence, industry leading ad creatives, and the ability to measure and optimize advertising campaigns to better

understand a consumer's mindset that captures attention and drives action and outcomes."[1]

27.     In other words, GumGum enables companies to sell advertising space on their websites, thereby earning revenue, and allows companies to place advertisements on other companies' websites, thereby driving brand awareness and sales.  To achieve this, GumGum uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

28.     The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the GumGum Tracker on the user's browser.  The GumGum Tracker, in turn, instructs the user's browser to send GumGum the user's IP address.

29.     Moreover, GumGum stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the GumGum Tracker instructs the user's browser to send the user's IP address through the cookie.  *See* Figure 2.

**Figure 2**:



30.     If the user clears his or her cookies, then the user wipes out the GumGum Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the GumGum Tracker on the user's browser, (ii) the GumGum Tracker instructs the browser to send GumGum the user's IP address, (iii) the GumGum Tracker stores a cookie in the browser cache, and (iv) GumGum will continue to receive the user's

---

[1] *About*, GUMGUM, https://gumgum.com/about (last visited Jan. 4, 2024).

IP address on subsequent Website visits through the cookie.

31.     In all cases, however, GumGum receives a user's IP address each and every time a user interacts with the website of one of GumGum's clients, including Defendant's Website.

32.     Indeed, a user's IP address is contained along with the cookie transmission to GumGum.  *See* Figure 3.

**Figure 3**:



33.     The GumGum Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data."  *Greenley*, 2023 WL 4833466, at *15.

34.     Further, the GumGum Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

35.     Because the GumGum Tracker captures the outgoing information—the IP address— from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

      2.     *Audiencerate Tracker*

36.     Audiencerate LTD ("Audiencerate") is a software-as-a-service company that develops the Audiencerate Tracker, which it provides to website owners like Defendant for a fee.

37.     According to Audiencerate, it "enable[s] data-driven advertising via [its] proprietary technology and platforms."[2]

38.     "One side of [Audiencerate's] business is dedicated to helping data owners monetize their data and license audiences in the world's largest programmatic media buying marketplaces. The other side provides targeting data to marketers, enabling them to model and target audiences

---

[2] AUDIENCERATE, https://www.audiencerate.com/ (last visited Jan. 4, 2024).

with more complexity and sophistication."[3]

39.     Just like GumGum, Audiencerate uses its Tracker to receive, store, and analyze data sent collected from website visitors, such as visitors of Defendant's Website.

40.     As discussed above, the first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the Audiencerate Tracker on the user's browser.  The Audiencerate Tracker, in turn, instructs the user's browser to send the user's IP address to Audiencerate.

41.     Moreover, Audiencerate stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the Audiencerate Tracker sends the user's IP address through the cookie.  *See* Figure 2, *supra*.

42.     If the user clears his or her cookies, then the user wipes out the Audiencerate Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website, the process begins over again: (i) Defendant's server installs the Audiencerate Tracker on the user's browser, (ii) the Audiencerate Tracker instructs the browser to send Audiencerate the user's IP address, (iii) the Audiencerate Tracker stores a cookie in the browser cache, and (iv) Audiencerate will continue to receive the user's IP address through the cookie on each subsequent Website visit.

43.     In all cases, however, Audiencerate receives a user's IP address each and every time a user interacts with the website of one of Audiencerate's clients, including Defendant's Website.

44.     The Audiencerate Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data."  *Greenley*, 2023 WL 4833466, at *15.

45.     Further, the Audiencerate Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  *James*, 2023 WL 7392285, at *13.

46.     Because the Audiencerate Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA§ 638.50(b).

---

[3] *AWS Enables Audiencerate to Process Over a Billion Requests per Week*, AWS (2020), https://aws.amazon.com/solutions/case-studies/audiencerate-case-study/.

**B.**      **Defendant Installed And Used The Trackers On Website Visitors Browsers Without Prior Consent Or A Court Order**

47.      Defendant owns and operates the Website, Gamespot.com, which is a video gaming website that provides news, reviews, previews, downloads, and other information on video games.

48.      When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[4]

49.      Often times, third-party scripts are installed on websites "for advertising purposes."[5]

50.      Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[6]

51.      Since at least June 2023, if not earlier, Defendant has incorporated the code of the Trackers into the code of its Website.  Thus, when Plaintiff and other users visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

52.      As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser.

53.      Upon installing the Trackers on its Website, Defendant uses the Trackers to collect the IP address of visitors to the Website, including the IP address of Plaintiff and Class Members. *See* Figures 4 (GumGum Tracker) and 5 (Audiencerate Tracker).

---

[44] *See* THIRD-PARTY TRACKING, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[5] *Id.*

[6] *Id.*

1

**Figure 4**:



**Figure 5**:



54.     Defendant then uses the IP address of Website visitors, including those of Plaintiff
and Class Members, to serve targeted advertisements and conduct website analytics.

55.     At no time prior to the installation of the Trackers on Plaintiff's and Class Members'

browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

**C.    Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

56.    The collection of Plaintiff's and Class Members personally identifying, non-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

57.    As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

*1.    Defendant Discloses User's Data To GumGum For The Purpose Of Marketing, Advertising, And Analytics*

58.    GumGum is a digital advertising platform that prides itself on its "ability to measure and optimize advertising campaigns to better understand a consumer's mindset that captures attention and drives action and outcomes."[7]

59.    GumGum helps companies like Defendant market, advertise, and analyze user data from its website.  One way GumGum assists with marketing and advertising is through its Ad Exchange, which is a direct marketplace where publishers and advertisers can buy and sell digital advertising space.[8]    Thus, when a user enters a website, GumGum enables companies to instantaneously buy and sell ad space in a way that it optimized to the particular user.

60.    According to GumGum, it uses artificial intelligence to scan the information on a web page to "deliver ads that are always relevant and align with what users are watching, reading and browsing online."[9]  GumGum boasts that their "solution offers higher quality ads and increased scale across thousands of premium publisher sites" and "allow[s] advertisers to maximize their KPIs by targeting audience through customized segments such as multicultural and sustainability."[10]

---

[7] *About*, GUMGUM, https://gumgum.com/about (last visited Jan. 3, 2024).

[8] *Exchange*, GUMGUM, https://gumgum.com/exchange (last visited Jan. 3, 2024).

[9] *Contextual vs. Behavioral Targeting*, GUMGUM (Dec. 29, 2022), https://gumgum.com/blog/contextual-vs-behavioral-targeting.

[10] *GumGum Annoucnes Industry's First 100% Brand Safe Ad Exchange*, GUMGUM (March 15, 2023), https://gumgum.com/press-releases/brand-safe-exchange.

---

61.     GumGum also offers companies "Attention Metrics," which analyzes "the amount of time and focus an individual gives to a particular advertisement or piece of content."[11]  This allows companies to "[t]arget consumers where they are most attentive, ensuring maximum performance and ad relevance for [its] brand."[12]  Thus, GumGum "helps advertisers optimize ad delivery to places where consumer attention is highest … [and] presents a wealth of opportunities to optimize campaign results [and] amplify brand lift."[13]

62.     In order to perform the functions listed above, GumGum needs to collect data that identifies a particular user.  This is why GumGum collects IP addresses: it allows GumGum to ascertain a user's location and target that user with advertisements tailored to their location, as well as to track a user's Website activity over time (*i.e.*, through repeated Website visits) to target a user with advertisements relevant to the user's personal browsing activity.

63.     Notably, GumGum claims that it uses "cookieless targeting" to drive significant brand KPIs, thereby not collecting personal identifiable information.[14]  However, GumGum is setting a visitor cookie for the user session, which transmits a user's IP addresses and other pieces of information.  *See* Figure 6.

**Figure 6**:



---

[11] *Attention*, GᴜᴍGᴜᴍ, https://gumgum.com/attention (last visited Jan. 3, 2024).

[12] *Id.*

[13] *Id.*

[14] *Verity*, GᴜᴍGᴜᴍ, https://gumgum.com/verity (last visited Jan. 3, 2024).

64.    Indeed, GumGum is actually listed as a cookie when using browser developer tools to examine the Website.  *See* Figure 7.

**Figure 7**:



65.    In other words, when users visit Defendant's Website, Defendant utilizes the GumGum Tracker to collecting IP addresses so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

      *2.    Defendant Discloses User's Data To Audiencerate For The Purpose Of Marketing, Advertising, And Analytics*

66.    Whereas GumGum specifically enables advertisements on websites, Audiencerate is a data platform that helps "distribute anonymously personally identifiable information-based and device-based segment data" for marketing, advertising, and analysis purposes.[15]

67.    Companies such as Defendant share their users' data with Audiencerate through

---

[15] *Product Overview*, AUDIENCERATE, https://app.audiencerate.com/doc/home (last visited Jan. 3, 2024).

"daily synchronization" via the Audiencerate Tracker.[16]  Audiencerate claims to anonymize the data and organizes it into segments.[17]  Then, companies use the segmented data to run targeted campaigns and perform data analysis through Audiencerate's platform.[18]  *See* Figure 8.



**Figure 8:**

68.     In addition to helping companies make better use of their own customer data, Audiencerate helps companies *sell* their customers' data to further "monetize data."[19]

69.     In order to perform the functions listed above, Audiencerate needs to collect data that identifies a particular user.  This is why Audiencerate collects IP addresses: it allows Audiencerate to segment users in order to run targeted campaigns and perform data analysis.

70.     In other words, companies like Defendant are collecting users' data and sending it to Audiencerate for a profit, whether it is by optimizing marketing campaigns or by purely selling the data.

---

[16] AUDIENCERATE, https://www.audiencerate.com/ (last visited Jan. 3, 2024).

[17] *Product Overview*, AUDIENCERATE, https://app.audiencerate.com/doc/home (last visited Jan. 3, 2024).

[18] *Id.*

[19] *Audiencerate partnership sees Sirdata integrated on Adform marketplace for the first time*, SIRDATA (Dec. 10, 2020), https://news.sirdata.com/en/press-release-audiencerate-sirdata-partnership/.

### III.   PLAINTIFF'S EXPERIENCE

71.     Plaintiff has visited the Website multiple times—including as long ago as June 2023 and as recently as January 2024—on his desktop browser.

72.     When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browser.  Defendant, GumGum, and Audiencerate, then used the Trackers to collect Plaintiff's IP address.  *See* Figures 9 (GumGum Tracker) and 10 (Audiencerate Tracker).

**Figure 9:**



**Figure 10:**



73.     Because Plaintiff had previously visited the Website but not cleared his cookies at the time the data in Figure 8 was collected, Plaintiff's IP address was sent to GumGum via the GumGum cookie, as opposed to being sent as standalone data as it would have been on Plaintiff's

first visit to the Website.  However, as noted above, the IP address is transmitted within the cookie. *See* Figure 3, *supra*.

74.    Defendant, GumGum, and Audiencerate used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's and advertisers' revenue.

75.    Plaintiff did not provide his prior consent to Defendant to install or use the Trackers on Plaintiff's browser.

76.    Defendant did not obtain a court order before installing or using the Trackers.

77.    Plaintiff has, therefore, had his privacy invaded by Defendant's violations of CIPA § 638.51(a).

## CLASS ALLEGATIONS

78.    Pursuant to Cal. Code Civ. Proc. § 382, Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP address collected by the Trackers (the "Class").

79.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

80.    **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the

merits of this litigation.   Moreover, the Class is ascertainable and identifiable from Defendant's records.

81.     **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.   These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

> (a)     Whether Defendant violated CIPA § 638.51(a);
>
> (b)     Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);
>
> (c)     Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;
>
> (d)     Whether Defendant sought or obtained a court order for its use of the Trackers; and
>
> (e)     Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

82.     **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had his IP address collected by the Trackers, which were installed and used by Defendant.

83.     **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.   The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

84.     **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.   Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.   Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSES OF ACTION**

**COUNT I**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

85.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

86.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

87.     CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

88.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

89.     The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones.  Cal. Penal Code § 638.50(b).

90.     At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers, and used the Trackers to collect Plaintiff's and Class Members' IP address.

91.     The Trackers do not collect the content of Plaintiff's and the Class's electronic communications with the Website.  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014)

("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

92.     Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

93.     Defendant did not obtain a court order to install or use the Trackers.

94.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)     For pre- and post-judgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief; and

(g)     For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  January 5, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:_____
            Emily A. Horne

L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
            ehorne@bursor.com

*Attorneys for Plaintiff*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Emily A. Horne, State Bar No. 347723
Bursor & Fisher, P.A., 1990 N California Blvd., Suite 940, Walnut Creek, CA 94596

TELEPHONE NO.: (925) 300-4455          FAX NO. : (925) 407-2700
EMAIL ADDRESS: ehorne@bursor.com
ATTORNEY FOR *(Name):*  Plaintiff Vishal Shah

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Vishal Shah v. Fandom, Inc.

**ELECTRONICALLY**
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**01/08/2024**
**Clerk of the Court**
BY: AUSTIN LAM
Deputy Clerk

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: **CGC-24-611488** |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $35,000) / [ ] Limited (Amount demanded is $35,000 or less) | [ ] Counter   [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:  DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[x] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is   [ ] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* One
5. This case [x] is   [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: January 5, 2024
Emily A. Horne
_____
(TYPE OR PRINT NAME)                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]                    **CIVIL CASE COVER SHEET**                    Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**                                                    CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or
    toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner
        Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic
        relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

CM-010 [Rev. January 1, 2024]                    **CIVIL CASE COVER SHEET**                    **Page 2 of 2**

For your protection and privacy, please press the Clear
This Form button after you have printed the form.                [Print this form]   [Save this form]      [Clear this form]

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**     **JUN 12, 2024**

**TIME:**     **10:30 am**

**PLACE:**    **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order   **without an appearance**   at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

**(SEE LOCAL RULE 4)**

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
FANDOM, INC.,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
VISHAL SHAH, individually and on behalf of all others similarly situated,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court of California,<br><br>County of San Francisco, 400 McAllister Street, San Francisco, CA 94102 | CASE NUMBER:<br>*(Número del Caso):*<br><br>**CGC-24-611488** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Emily A. Horne, Bursor & Fisher, P.A., 1990 N California Blvd., Suite 940, Walnut Creek, CA 94596, Tel.: (925) 300-4455

| DATE:<br>*(Fecha)* **01/09/2024** | Clerk, by<br>*(Secretario)* **AUSTIN LAM** | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Fandom, Inc.

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

| Print this form | Save this form | Clear this form |
|---|---|---|



**CT Corporation**
**Service of Process Notification**
01/23/2024
CT Log Number 545596326

## Service of Process Transmittal Summary

**TO:**  Desmond Cussen
Fandom, Inc
130 SUTTER ST FL 4
SAN FRANCISCO, CA 94104-4003

**RE:**  **Process Served in California**

**FOR:**  Fandom, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | VISHAL SHAH, individually and on behalf of all others similarly situated vs. FANDOM, INC. |
| **CASE #:** | CGC24611488 |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 01/23/2024 at 13:38 |
| **JURISDICTION SERVED:** | California |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Desmond Cussen  legal@fandom.com |
| | Email Notification,  Karolina Krol  kkrol@fandom.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 330 N BRAND BLVD |
| | STE 700 |
| | GLENDALE, CA 91203 |
| | 866-539-8692 |
| | CorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                                    Tue, Jan 23, 2024
**Server Name:**                             DROP SERVICE

| | |
|---|---|
| Entity Served | FANDOM INC |
| Case Number | CGC24611488 |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
FANDOM, INC.,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
VISHAL SHAH, individually and on behalf of all others similarly situated,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* Superior Court of California, <br><br> County of San Francisco, 400 McAllister Street, San Francisco, CA 94102 | CASE NUMBER: <br> *(Número del Caso):* <br><br> **CGC-24-611488** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Emily A. Horne, Bursor & Fisher, P.A., 1990 N California Blvd., Suite 940, Walnut Creek, CA 94596, Tel.: (925) 300-4455

| DATE: <br> *(Fecha)* **01/09/2024** | Clerk, by <br> *(Secretario)* **AUSTIN LAM** | , Deputy <br> *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Fandom, Inc.
   under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
              ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
              ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
              ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> *www.courts.ca.gov* |

For your protection and privacy, please press the Clear This Form button after you have printed the form.

| Print this form | Save this form |
|---|---|



## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **JUN 12, 2024**

**TIME:** **10:30 am**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

> CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

> **IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**
>
> (SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400 McAllister Street, Room 103-A**
**San Francisco, CA 94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* <br> Emily A. Horne, State Bar No. 347723 <br> Bursor & Fisher, P.A., 1990 N California Blvd., Suite 940, Walnut Creek, CA 94596 <br><br> TELEPHONE NO.: (925) 300-4455    FAX NO.: (925) 407-2700 <br> EMAIL ADDRESS: ehorne@bursor.com <br> ATTORNEY FOR *(Name):* Plaintiff Vishal Shah | *FOR COURT USE ONLY* <br><br> ELECTRONICALLY <br> **F I L E D** <br> *Superior Court of California,* <br> *County of San Francisco* <br><br> **01/08/2024** <br> **Clerk of the Court** <br> BY: AUSTIN LAM <br> **Deputy Clerk** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Vishal Shah v. Fandom, Inc.

| CIVIL CASE COVER SHEET <br> ☒ **Unlimited**    ☐ **Limited** <br> (Amount (Amount <br> demanded demanded is <br> exceeds $35,000) $35,000 or less) | Complex Case Designation <br> ☐ Counter   ☐ Joinder <br><br> Filed with first appearance by defendant <br> (Cal. Rules of Court, rule 3.402) | CASE NUMBER: **CGC-24-611488** <br><br> JUDGE: <br> DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☒ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☒ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☒ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☒ Substantial amount of documentary evidence
   d. ☒ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary  b. ☒ nonmonetary; declaratory or injunctive relief  c. ☐ punitive
4. Number of causes of action *(specify):* One
5. This case ☒ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: January 5, 2024

Emily A. Horne
_____
(TYPE OR PRINT NAME)                           ▶ _____ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Page 2 of 2

For your protection and privacy, please press the Clear This Form button after you have printed the form.

| Print this form | Save this form | | Clear this form |



# Superior Court of California, County of San Francisco
## Alternative Dispute Resolution
## Information Package



> The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

## WHAT IS ADR?

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences.   In ADR, trained, impartial people decide disputes or help parties decide disputes themselves.  They can help parties resolve disputes without having to go to trial.

## WHY CHOOSE ADR?

It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.**  A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

**\*\*Electing to participate in an ADR process does not stop the time period to
respond to a complaint or cross-complaint\*\***

## WHAT ARE THE ADR OPTIONS?

The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

## 1) MANDATORY SETTLEMENT CONFERENCES

Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF),** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending. Experienced professional mediators work with parties to arrive at a mutually agreeable solution. The mediators provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. BASF staff handles conflict checks and full case management. The success rate for the program is 67% and the satisfaction rate is 99%. BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

**(B) JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

**(D) COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

### 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

### (A) JUDICIAL ARBITRATION

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

### (B) PRIVATE ARBITRATION

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
415-551-3869
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. <u>YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.</u>

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: | |
| ATTORNEY FOR *(Name):* | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, CA 94102-4514 | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: _____ |
|---|---|
| | DEPARTMENT 610 |

**1)    The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐    **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐    **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session.  Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available  to those who qualify. communityboards.org

☐    **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐    **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no  equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this  program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

☐    **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐30-90 days  ☐ 90-120 days  ☐ Other (please specify) _____

☐    **Other ADR process** (describe)_____

**2)    The parties agree that the ADR Process shall be completed by (date):** _____
**3)    Plaintiff(s) and Defendant(s) further agree as follows:**

_____

| | |
|---|---|
| _____<br>Name of Party Stipulating | _____<br>Name of Party Stipulating |
| _____<br>Name of Party or Attorney Executing Stipulation | _____<br>Name of Party or Attorney Executing Stipulation |
| _____<br>Signature of Party or Attorney | _____<br>Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | ☐ Plaintiff ☐ Defendant ☐ Cross-defendant |
| Dated: _____ | Dated: _____ |

☐  *Additional signature(s) attached*

ADR-2  10/18                    **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)

2
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940

3
Walnut Creek, CA 94596
Telephone: (925) 300-4455

4
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

5
            ehorne@bursor.com

6
*Attorneys for Plaintiff*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**01/08/2024**
**Clerk of the Court**
BY: AUSTIN LAM
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| VISHAL SHAH, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FANDOM, INC., <br><br> Defendant. | Case No.   **CGC-24-611488** <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Vishal Shah ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant Fandom, Inc. ("Defendant") owns and operates a website, Gamespot.com (the "Website" or "Gamespot").

2.      When users visit the Website, Defendant causes two trackers—the GumGum Tracker and Audiencerate Tracker (the "Trackers")—to be installed on Website visitors' internet browsers. Defendant then uses these Trackers to collect Website visitors' IP addresses.

3.      Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA"). Cal. Penal Code § 638.50(b); *see also Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

4.      By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).

5.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

## PARTIES

6.      Plaintiff Shah resides in Orange County, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff Shah was in California when he visited the Website.

7.      Defendant Fandom, Inc. is a California company, with its principal place of business located in California.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution and Cal. Code Civ. Proc § 410.10. This action is brought as a class action on behalf of Plaintiff and Class Members pursuant to Cal. Code Civ. Proc. § 382.

9.     This Court has personal jurisdiction over Defendant because it is headquartered and incorporated in California.

10.     Venue is proper in this County because Defendant resides in this County.

## FACTUAL ALLEGATIONS

### I.     THE CALIFORNIA INVASION OF PRIVACY ACT

11.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

12.     As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

13.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

14.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

15.     In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

16.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

17.     For example, if a user *sends an email*, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if that same user *receives an email*, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

18.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

19.     Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.     DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

### A.     The Trackers Are "Pen Registers"

20.     To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions. *See* Figure 1.

**Figure 1:**



21.     The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

22.     In addition, the server's instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address—to GumGum and Audiencerate.

23.     The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132). The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132). Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains geographical location. Through an IP address, the device's state, city, and zip code can be determined.

24.     As alleged below, Defendant installs each of the Trackers on the user's browser, and the Trackers collect information—users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user. Accordingly, the Trackers are each "pen registers."

        *1.      GumGum Tracker*

25.     GumGum, Inc. ("GumGum") is a software-as-a-service company that develops the GumGum Tracker, which it provides to website owners like Defendant for a fee.

26.     According to GumGum, it "delivers the next generation of contextual intelligence, industry leading ad creatives, and the ability to measure and optimize advertising campaigns to better

understand a consumer's mindset that captures attention and drives action and outcomes."[1]

27.   In other words, GumGum enables companies to sell advertising space on their websites, thereby earning revenue, and allows companies to place advertisements on other companies' websites, thereby driving brand awareness and sales.  To achieve this, GumGum uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

28.   The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the GumGum Tracker on the user's browser.  The GumGum Tracker, in turn, instructs the user's browser to send GumGum the user's IP address.

29.   Moreover, GumGum stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the GumGum Tracker instructs the user's browser to send the user's IP address through the cookie.  *See* Figure 2.

**Figure 2:**



30.   If the user clears his or her cookies, then the user wipes out the GumGum Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the GumGum Tracker on the user's browser, (ii) the GumGum Tracker instructs the browser to send GumGum the user's IP address, (iii) the GumGum Tracker stores a cookie in the browser cache, and (iv) GumGum will continue to receive the user's

---

[1] *About*, GUMGUM, https://gumgum.com/about (last visited Jan. 4, 2024).

IP address on subsequent Website visits through the cookie.

31.    In all cases, however, GumGum receives a user's IP address each and every time a user interacts with the website of one of GumGum's clients, including Defendant's Website.

32.    Indeed, a user's IP address is contained along with the cookie transmission to GumGum. *See* Figure 3.

**Figure 3:**



33.    The GumGum Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 2023 WL 4833466, at *15.

34.    Further, the GumGum Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

35.    Because the GumGum Tracker captures the outgoing information—the IP address— from visitors to websites, it is a "pen register" for the purposes of CIPA§ 638.50(b).

        2.    *Audiencerate Tracker*

36.    Audiencerate LTD ("Audiencerate") is a software-as-a-service company that develops the Audiencerate Tracker, which it provides to website owners like Defendant for a fee.

37.    According to Audiencerate, it "enable[s] data-driven advertising via [its] proprietary technology and platforms."[2]

38.    "One side of [Audiencerate's] business is dedicated to helping data owners monetize their data and license audiences in the world's largest programmatic media buying marketplaces. The other side provides targeting data to marketers, enabling them to model and target audiences

---

[2] AUDIENCERATE, https://www.audiencerate.com/ (last visited Jan. 4, 2024).

with more complexity and sophistication."[3]

39.     Just like GumGum, Audiencerate uses its Tracker to receive, store, and analyze data sent collected from website visitors, such as visitors of Defendant's Website.

40.     As discussed above, the first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the Audiencerate Tracker on the user's browser.  The Audiencerate Tracker, in turn, instructs the user's browser to send the user's IP address to Audiencerate.

41.     Moreover, Audiencerate stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the Audiencerate Tracker sends the user's IP address through the cookie. *See* Figure 2, *supra*.

42.     If the user clears his or her cookies, then the user wipes out the Audiencerate Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website, the process begins over again: (i) Defendant's server installs the Audiencerate Tracker on the user's browser, (ii) the Audiencerate Tracker instructs the browser to send Audiencerate the user's IP address, (iii) the Audiencerate Tracker stores a cookie in the browser cache, and (iv) Audiencerate will continue to receive the user's IP address through the cookie on each subsequent Website visit.

43.     In all cases, however, Audiencerate receives a user's IP address each and every time a user interacts with the website of one of Audiencerate's clients, including Defendant's Website.

44.     The Audiencerate Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 2023 WL 4833466, at *15.

45.     Further, the Audiencerate Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 2023 WL 7392285, at *13.

46.     Because the Audiencerate Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

---

[3] *AWS Enables Audiencerate to Process Over a Billion Requests per Week*, AWS (2020), https://aws.amazon.com/solutions/case-studies/audiencerate-case-study/.

**B.      Defendant Installed And Used The Trackers On Website Visitors Browsers Without Prior Consent Or A Court Order**

47.      Defendant owns and operates the Website, Gamespot.com, which is a video gaming website that provides news, reviews, previews, downloads, and other information on video games.

48.      When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[4]

49.      Often times, third-party scripts are installed on websites "for advertising purposes."[5]

50.      Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[6]

51.      Since at least June 2023, if not earlier, Defendant has incorporated the code of the Trackers into the code of its Website. Thus, when Plaintiff and other users visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

52.      As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser.

53.      Upon installing the Trackers on its Website, Defendant uses the Trackers to collect the IP address of visitors to the Website, including the IP address of Plaintiff and Class Members. *See* Figures 4 (GumGum Tracker) and 5 (Audiencerate Tracker).

---

[44]   *See* THIRD-PARTY TRACKING, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[5] *Id.*

[6] *Id.*

**Figure 4:**



**Figure 5:**



54.    Defendant then uses the IP address of Website visitors, including those of Plaintiff and Class Members, to serve targeted advertisements and conduct website analytics.

55.    At no time prior to the installation of the Trackers on Plaintiff's and Class Members's

browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**C.    Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

56.    The collection of Plaintiff's and Class Members personally identifying, non-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

57.    As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

*1.    Defendant Discloses User's Data To GumGum For The Purpose Of Marketing, Advertising, And Analytics*

58.    GumGum is a digital advertising platform that prides itself on its "ability to measure and optimize advertising campaigns to better understand a consumer's mindset that captures attention and drives action and outcomes."[7]

59.    GumGum helps companies like Defendant market, advertise, and analyze user data from its website. One way GumGum assists with marketing and advertising is through its Ad Exchange, which is a direct marketplace where publishers and advertisers can buy and sell digital advertising space.[8] Thus, when a user enters a website, GumGum enables companies to instantaneously buy and sell ad space in a way that it optimized to the particular user.

60.    According to GumGum, it uses artificial intelligence to scan the information on a web page to "deliver ads that are always relevant and align with what users are watching, reading and browsing online."[9] GumGum boasts that their "solution offers higher quality ads and increased scale across thousands of premium publisher sites" and "allow[s] advertisers to maximize their KPIs by targeting audience through customized segments such as multicultural and sustainability."[10]

---

[7] *About*, GUMGUM, https://gumgum.com/about (last visited Jan. 3, 2024).

[8] *Exchange*, GUMGUM, https://gumgum.com/exchange (last visited Jan. 3, 2024).

[9] *Contextual vs. Behavioral Targeting*, GUMGUM (Dec. 29, 2022), https://gumgum.com/blog/contextual-vs-behavioral-targeting.

[10] *GumGum Annoucnes Industry's First 100% Brand Safe Ad Exchange*, GUMGUM (March 15, 2023), https://gumgum.com/press-releases/brand-safe-exchange.

61.     GumGum also offers companies "Attention Metrics," which analyzes "the amount of time and focus an individual gives to a particular advertisement or piece of content."[11] This allows companies to "[t]arget consumers where they are most attentive, ensuring maximum performance and ad relevance for [its] brand."[12] Thus, GumGum "helps advertisers optimize ad delivery to places where consumer attention is highest ... [and] presents a wealth of opportunities to optimize campaign results [and] amplify brand lift."[13]

62.     In order to perform the functions listed above, GumGum needs to collect data that identifies a particular user. This is why GumGum collects IP addresses: it allows GumGum to ascertain a user's location and target that user with advertisements tailored to their location, as well as to track a user's Website activity over time (i.e., through repeated Website visits) to target a user with advertisements relevant to the user's personal browsing activity.

63.     Notably, GumGum claims that it uses "cookieless targeting" to drive significant brand KPIs, thereby not collecting personal identifiable information.[14] However, GumGum is setting a visitor cookie for the user session, which transmits a user's IP addresses and other pieces of information. *See* Figure 6.

**Figure 6:**



---

[11] *Attention*, GUMGUM, https://gumgum.com/attention (last visited Jan. 3, 2024).

[12] *Id.*

[13] *Id.*

[14] *Verity*, GUMGUM, https://gumgum.com/verity (last visited Jan. 3, 2024).

64.     Indeed, GumGum is actually listed as a cookie when using browser developer tools to examine the Website. *See* Figure 7.

**Figure 7:**



65.     In other words, when users visit Defendant's Website, Defendant utilizes the GumGum Tracker to collecting IP addresses so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements. All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

> 2.     *Defendant Discloses User's Data To Audiencerate For The Purpose Of Marketing, Advertising, And Analytics*

66.     Whereas GumGum specifically enables advertisements on websites, Audiencerate is a data platform that helps "distribute anonymously personally identifiable information-based and device-based segment data" for marketing, advertising, and analysis purposes.[15]

67.     Companies such as Defendant share their users' data with Audiencerate through

---

[15] *Product Overview*, AUDIENCERATE, https://app.audiencerate.com/doc/home (last visited Jan. 3, 2024).

"daily synchronization" via the Audiencerate Tracker.[16]  Audiencerate claims to anonymize the data and organizes it into segments.[17]  Then, companies use the segmented data to run targeted campaigns and perform data analysis through Audiencerate's platform.[18]  *See* Figure 8.



**Figure 8:**

68.     In addition to helping companies make better use of their own customer data, Audiencerate helps companies *sell* their customers' data to further "monetize data."[19]

69.     In order to perform the functions listed above, Audiencerate needs to collect data that identifies a particular user.  This is why Audiencerate collects IP addresses: it allows Audiencerate to segment users in order to run targeted campaigns and perform data analysis.

70.     In other words, companies like Defendant are collecting users' data and sending it to Audiencerate for a profit, whether it is by optimizing marketing campaigns or by purely selling the data.

---

[16] AUDIENCERATE, https://www.audiencerate.com/ (last visited Jan. 3, 2024).

[17] *Product Overview*, AUDIENCERATE, https://app.audiencerate.com/doc/home (last visited Jan. 3, 2024).

[18] *Id.*

[19] *Audiencerate partnership sees Sirdata integrated on Adform marketplace for the first time*, SIRDATA (Dec. 10, 2020), https://news.sirdata.com/en/press-release-audiencerate-sirdata-partnership/.

### III.    PLAINTIFF'S EXPERIENCE

71.    Plaintiff has visited the Website multiple times—including as long ago as June 2023 and as recently as January 2024—on his desktop browser.

72.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browser.  Defendant, GumGum, and Audiencerate, then used the Trackers to collect Plaintiff's IP address.  *See* Figures 9 (GumGum Tracker) and 10 (Audiencerate Tracker).

**Figure 9:**



**Figure 10:**



73.    Because Plaintiff had previously visited the Website but not cleared his cookies at the time the data in Figure 8 was collected, Plaintiff's IP address was sent to GumGum via the GumGum cookie, as opposed to being sent as standalone data as it would have been on Plaintiff's

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                   15

first visit to the Website. However, as noted above, the IP address is transmitted within the cookie. *See* Figure 3, *supra*.

74.     Defendant, GumGum, and Audiencerate used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's and advertisers' revenue.

75.     Plaintiff did not provide his prior consent to Defendant to install or use the Trackers on Plaintiff's browser.

76.     Defendant did not obtain a court order before installing or using the Trackers.

77.     Plaintiff has, therefore, had his privacy invaded by Defendant's violations of CIPA § 638.51(a).

## CLASS ALLEGATIONS

78.     Pursuant to Cal. Code Civ. Proc. § 382, Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP address collected by the Trackers (the "Class").

79.     The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

80.     **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the

merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

81.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a)    Whether Defendant violated CIPA § 638.51(a);

(b)    Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

(c)    Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(d)    Whether Defendant sought or obtained a court order for its use of the Trackers; and

(e)    Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

82.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had his IP address collected by the Trackers, which were installed and used by Defendant.

83.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

84.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also

1   presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device

2   presents far fewer management difficulties and provides the benefits of single adjudication, economy

3   of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class

4   treatment of the liability issues will ensure that all claims and claimants are before this Court for

5   consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 638.51(a)

85.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

86.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

87.   CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

88.   A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

89.   The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

90.   At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers, and used the Trackers to collect Plaintiff's and Class Members' IP address.

91.   The Trackers do not collect the content of Plaintiff's and the Class's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014)

("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

92.     Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

93.     Defendant did not obtain a court order to install or use the Trackers.

94.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)     For pre- and post-judgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief; and

(g)     For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  January 5, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _____
        Emily A. Horne

L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
         ehorne@bursor.com

*Attorneys for Plaintiff*